[Cite as *State v. Scott*, 2020-Ohio-3230.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NOS. CA2019-07-051<br>CA2019-07-052 |
| | : | |
| - vs - | : | O P I N I O N<br>6/8/2020 |
| | : | |
| ZACHARY E. SCOTT, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2015CR000519

D. Vincent Faris, Clermont County Prosecuting Attorney, Nicholas Horton, 76 South Riverside Drive, 2nd Floor, Batavia, Ohio 45103, for appellee

W. Stephen Haynes, Clermont County Public Defender, Robert F. Benintendi, 302 East Main Street, Batavia, Ohio 45103, for appellant

**HENDRICKSON, P.J.**

{¶1} Appellant, Zachary Scott, appeals his conviction in the Clermont County Court of Common Pleas for gross sexual imposition. For the reasons discussed below, we affirm Scott's conviction.

{¶2} In September 2015, a Clermont County grand jury indicted Scott on one count of gross sexual imposition and three counts of rape. The charges arose after the victim,

P.W., alleged Scott assaulted her seven or eight times in her mother's home in Clermont County when she was nine years old. Scott pled not guilty to the charges.

{¶3} In November 2015, the state filed a bill of particulars. With regard to the gross sexual imposition charge, the state alleged that on or about June 2, 2014, Scott forced P.W. to place her hand on his penis while he was naked. P.W. was nine years old at the time of the incident. In May 2017, Scott filed a Notice of Alibi, indicating he was not at the victim's home during some or all of the dates alleged in the indictment.

{¶4} While this case remained pending, Scott was detained in federal custody on unrelated charges. In June 2017, while being held on the pending federal charges, Scott failed to appear for his jury trial in Clermont County. As a result, the trial court issued a bench warrant. In December 2017, the trial court filed a writ of habeas corpus ad prosequendum, commanding the U.S. Marshal to return Scott to Clermont County. In January 2018, the federal court released Scott to the custody of Clermont County officials in order to address his pending charges in Clermont County.

{¶5} In June 2018, the state moved the trial court to amend the indictment to reflect that, with regard to the gross sexual imposition charge, the events giving rise to the charge occurred "on or about June 2, 2014 through June 10, 2015." The trial court granted the state's motion. That same day, the state also filed an amended bill of particulars. Relating to the gross sexual imposition charge, the state alleged that in addition to the facts alleged in the indictment, Scott forced the victim to touch his penis in her bedroom between June 2, 2014 and May 28, 2015.

{¶6} The matter proceeded to a jury trial on March 6, 2019. P.W., P.W.'s mother ("Mother"), P.W.'s older sister, Detective John Pavia with the Union Township Police Department, Officer Brandon Bock with the Union Township Police Department, the doctor

who examined P.W., a social worker with Children's Hospital, a social worker with the Mayerson Center, and Scott's ex-girlfriend testified on behalf of the state. Scott's father testified on Scott's behalf.

{¶7} Following the state's case-in-chief, the state moved the court to amend the dates of the indictment. Specifically, the state sought to expand the date range in the indictment to May 1, 2014 through June 10, 2015 in order to conform with P.W.'s testimony. After discussing the motion with counsel, the trial court denied the state's motion. After the court denied the state's motion to amend the indictment, Scott moved the court for acquittal pursuant to Crim.R. 29, which the court denied.

{¶8} On March 14, 2019, the jury found Scott guilty of gross sexual imposition but not guilty of the three rape charges. After a hearing, the trial court sentenced Scott to 60 months in prison.

{¶9} Scott now appeals, raising three assignments of error.

{¶10} Assignment of Error No. 1:

{¶11} THE TRIAL COURT ERRED TO THE PREJUDICE OF THE DEFENDANT BY FAILING TO GRANT DEFENDANT'S CRIMINAL RULE 29 MOTION FOR ACQUITTAL BECAUSE THE STATE FAILED TO ESTABLISH GUILT BEYOND A REASONABLE DOUBT.

{¶12} Assignment of Error No. 2:

{¶13} THE TRIAL COURT ERRED IN ENTERING A FINDING OF GUILTY BECAUSE SUCH A VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶14} In his first two assignments of error, Scott argues the trial court erred in denying his Crim.R. 29 motion as his conviction was supported by insufficient evidence,

and that the verdict was otherwise against the manifest weight of the evidence. Specifically, Scott contends the state failed to prove (1) the gross sexual imposition offense occurred within the range of dates contained in the amended indictment; and (2) that Scott forced P.W. to touch his penis.

{¶15} Crim.R. 29(A) provides that "[t]he court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." An appellate court reviews the denial of a Crim.R. 29(A) motion pursuant to the same standard as that used to review a sufficiency-of-the-evidence claim. *State v. Wright*, 12th Dist. Fayette No. CA2017-10-021, 2018-Ohio-1982, ¶ 22.

{¶16} When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would support a conviction. *Id.* at ¶ 23. The relevant inquiry is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Watson*, 12th Dist. Warren No. CA2014-08-110, 2015-Ohio-2321, ¶ 22.

{¶17} A manifest weight challenge scrutinizes the proclivity of the greater amount of credible evidence, offered at a trial, to support one side of the issue over another. *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. In assessing whether a conviction is against the manifest weight of the evidence, a reviewing court examines the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses, and determines whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction

must be reversed and a new trial ordered. *State v. Morgan*, 12th Dist. Butler Nos. CA2013-08-146 and CA2013-08-147, 2014-Ohio-2472, ¶ 34.

{¶18} Scott was convicted of gross sexual imposition, in violation of R.C. 2907.05(A)(4), which states:

> No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:
>
> * * *
>
> (4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person."

{¶19} The Revised Code defines "sexual contact" as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶20} At trial, Mother testified that she and Scott met at work in 2010. The two began dating shortly after meeting and Scott moved into Mother's Clermont County home two months later. Before moving in with Mother, Scott lived with his parents.

{¶21} At the time Scott moved in with Mother, she was working third shift, from 9:30 p.m. to 6:00 a.m., five days a week. While Mother was working, Scott was responsible for watching P.W. and her younger sister. Mother testified that upon returning home from work, she saw Scott in bed with P.W. on more than one occasion. According to Mother, the first time Scott and P.W. were in Mother's bed. Mother indicated she confronted Scott, but discovered him in bed with P.W. again after the confrontation.

{¶22} Mother indicated that her relationship with Scott was "off and on" until she

ended it in 2015.  During their relationship, Scott lived with Mother off and on, including in June, July, and August of 2014.  Mother testified that when Scott was not living with her, he was living with his parents.  In the fall of 2014, Scott and Mother broke up and Scott moved in with a girlfriend until early 2015.  One month after Scott left his girlfriend's home, he returned to live with Mother.   Scott remained living with Mother until approximately May 2015 when the two ended their relationship.

{¶23}  P.W. testified that she met Scott when she was approximately seven years old.  P.W. described Scott as the father of her younger sister and her mother's on-again, off-again live-in boyfriend.  P.W. indicated between her ninth birthday on May 26, 2014 and her tenth birthday on May 26, 2015, Scott assaulted her seven or eight times.  The assaults took place in Mother's home in Clermont County when Mother was working and Scott was watching P.W. and her younger sister.

{¶24}  P.W. described the first instance of sexual abuse, which occurred when she was "about to be nine," "right before [her] birthday."  According to P.W., Scott asked if she would like to lie down in Mother's bed and watch a movie with him after her mother left for work that evening.  P.W. agreed, and fell asleep while watching the movie.  At some point, P.W. woke up to find that her pants, underwear, and shirt had been removed, and that Scott was naked and on top of her.  During that incident, P.W. indicated Scott's "lolo" went inside her "lolo" and touched and rubbed against her "back part."  It was established at trial that P.W. referred to a male's penis and a female's vagina as a person's "lolo."  After P.W. realized what was happening, she got up, threw her clothes away, got new pajamas, and lay down in a different location.

{¶25}  According to P.W., after she turned nine Scott put his "lolo" into her "lolo" seven or eight times; tried to put his "lolo" in her "back part" seven or eight times; and that

- 6 -

his "lolo" went into her "back part" once. P.W. further testified that Scott had her touch his "lolo" and described it as feeling "slimy." P.W. indicated Scott would grab her arm and try to make her touch his penis "all the time," however she only touched it on one occasion. While P.W. could not remember the months Scott assaulted her, she testified she "somewhat [had] a timeline," which was from somewhere around her ninth birthday to somewhere around her tenth birthday. P.W. further confirmed that each of the assaults occurred at Mother's home in P.W.'s bed, Mother's bed, or on the couch.

{¶26} On June 5, 2015, P.W. disclosed the abuse to her father's girlfriend's daughter when the two were exchanging "secrets." According to P.W., the last instance of abuse occurred around her tenth birthday, two weeks before she told her secret. After hearing P.W.'s story, the daughter informed her mother of the "secret," who told P.W.'s older sister. The following day, P.W.'s older sister told Mother about the abuse, and Mother took P.W. to Children's Hospital.

{¶27} P.W. was interviewed by a social worker with Children's Hospital shortly after arriving. The social worker testified that the purpose of that interview was to determine whether a doctor needed to prepare a sexual assault kit on P.W. The social worker indicated that during the interview, P.W. stated Scott put his "lolo" into her "bottom." According to P.W., the first time happened two weeks after her ninth birthday and the last time happened two days after her tenth birthday. P.W. told the social worker that during that period, Scott had assaulted her "about nine times." P.W. did not detail all nine instances of assault; however, she stated there Scott had raped her nine times and that Scott had grabbed her hand and tried to get her to rub his "lolo." The social worker indicated that it was typical in children to not specifically recall every incident where the abuse occurred "that many" times.

{¶28} Because the last instance of sexual assault occurred two weeks prior to P.W.'s hospital visit, a sexual assault kit was not done. However, a doctor at Children's Hospital determined a physical examination of P.W. should be conducted. At trial, the doctor who examined P.W. testified that the results of the victim's physical exam were normal, however, that alone did not confirm nor deny that sexual abuse occurred. Rather, according to the doctor, most children who are abused have normal exams. The doctor further discussed P.W.'s medical record from Children's Hospital, including the results obtained after P.W. engaged in therapy in September 2015. Specifically, P.W.'s record indicated she exhibited posttraumatic stress disorder, including symptoms of avoidance, increased anger, hypervigilance, and somatic symptoms. The doctor explained that in her experience dealing with children of sexual assault, the psychological ramifications are usually more significant than the physical. Thus, the psychological findings can "trump" the physical findings of an exam.

{¶29} After completing the medical exam, Mother took P.W. to the Union Township Police Department, where an officer took P.W.'s statement. The case was then assigned to Detective John Pavia, who testified he initiated contact with Mother on June 6, 2015. Upon contacting Mother, the detective scheduled an interview for P.W. at the Mayerson Center, a child advocacy center located inside Children's Hospital. According to the detective, it is part of his protocol in investigating child sex abuse cases to send juvenile victims to the Mayerson Center as the center is trained in interviewing children and young victims of sexual assault. The detective indicated this protocol was in place in order to limit the number of interviews children are required to provide.

{¶30} On June 16, 2015, P.W. met with Andrea Richey, a social worker at the Mayerson Center. That day, Richey conducted a forensic interview of P.W., which was

recorded on a DVD and played at trial during Richey's testimony. During the interview, P.W. described what Scott did to her over the past year. Specifically, P.W. stated Scott raped her nine times. When asked to describe what Scott would do, P.W. indicated she would wake up to Scott naked and "jumping on top of [her]." P.W. stated the rapes involved his "really low part" or "lolo" and her "really low part" or "lolo." She then indicated she could feel his low part touching inside her "lolo" and that Scott's "lolo" touched inside her "butt." P.W. also told Richey that Scott would grab her wrist "really hard" and attempt to force her to touch his penis. She stated that on one occasion she woke up to Scott jerking her arm and realized she was touching something and it "freaked [her] out." She stated it felt "slimy." P.W. indicated that she believed Scott was either asleep or pretending to be asleep when the assaults occurred, but was unsure because he was holding himself up with his arms.

{¶31} P.W. told Richey that she knew "it" started two weeks after she turned nine, and ended two days after she turned ten. P.W. stated that although Scott raped her, he never threatened her. According to P.W., the assaults would typically occur after Scott asked her if she would like to watch a movie with him. P.W. described the first assault, and indicated she and Scott watched a movie until she fell asleep. P.W. woke up at three in the morning, Scott was on top of her, and they were both naked. Once she woke up, P.W. pushed Scott off of her, and then ran to her bedroom and locked the door. P.W. also described the last instance of assault, and indicated that she declined Scott's invitation to watch a movie together that evening and Scott proceeded to ask if he could lie in bed with her. Although P.W. told Scott no, he came into her bedroom after she was asleep and "started doing it." She woke up and her pants and underwear were off and Scott was naked. After P.W. woke up, she grabbed her blanket and pillow and went to the couch.

{¶32} P.W. further stated she did not want to talk about the abuse initially because

- 9 -

Scott was Mother's boyfriend and her sister's dad. P.W. also indicated she was afraid to see Scott again because she worried that he would end up killing her for telling the police what happened.

{¶33} Richey summarized her interview with P.W. into a report. As a result of P.W.'s statements during the interview, Richey testified she referred P.W. for counseling and therapy. Specifically, after consulting with the Mayerson Center's mental health team, Richey recommended P.W. engage in six sessions of therapy. Both Richey and the mental health team agreed the therapy sessions would be the "best first step" for P.W. Richey confirmed at trial that P.W. attended the recommended sessions. Mother further confirmed during her testimony that P.W. remained in counseling at the time of trial, nearly four years after her forensic interview at the Mayerson Center.

{¶34} Thereafter, the reports from the Mayerson Center and Children's Hospital were forwarded to Detective Pavia, who then continued his investigation. As part of the investigation, the detective facilitated a controlled call between Mother and Scott. A recording of the call was played for the jury and admitted into evidence. During the call, Mother informed Scott of P.W.'s accusations, including that the assaults began shortly after P.W. turned nine. Scott indicated there was "no way" he assaulted P.W. and denied that anything happened. Scott further claimed he and Mother were not together when P.W. turned nine and therefore he could not have done this. Specifically, Scott claimed he was living with his parents at that time and he was not at Mother's home. Mother stated she was alarmed because she had returned home from work to find P.W. asleep in their bed before and had similarly found Scott sleeping in P.W.'s bed. Mother also indicated the timing "made sense," as P.W. began acting differently and struggling in school around the time she turned nine. Despite his denial, Scott admitted he had fallen asleep in bed with

P.W., but only for short periods of time. Scott further indicated that he was going to "shoot himself" as a result of P.W.'s accusations.

{¶35} As a result of the call, the detective alerted the Hamilton County authorities as to Scott's suicidal threats. At trial, the detective stated he found Scott's statements on the call concerning. Specifically, the detective was concerned that Scott admitted he had slept in P.W.'s bed and made suicidal statements.

{¶36} Scott's father ("Father") testified on Scott's behalf. Father testified that Scott lived with him from March 31, 2014 until late October. From November 2014 to February 2015 Scott moved in with a new girlfriend. When Scott and his girlfriend broke up, Scott returned to live with Father in March of 2015. On April 1, 2015, Scott moved in with Mother until late May 2015. Father testified that on May 23, 2015, Scott moved back in with Father. Thus, to the best of Father's knowledge, Scott was at Father's home every night between March 31, 2014 until late October 2014. However, on cross-examination, Father admitted that Scott would watch P.W. and her younger sister while Mother was working and also acknowledged that he did not tell Detective Pavia that Scott was living with him during a majority of 2014. Father further admitted that he was unaware how much contact Scott had with Mother between March and October of 2014 and was also unaware that Scott was at Mother's home during that time. Despite Father's lack of knowledge regarding Scott and Mother's relationship, Father testified he believed Mother encouraged P.W. to "make this story up."

{¶37} On appeal, Scott initially argues that the testimony at trial established that the gross sexual imposition offense occurred in early May 2014, a full month before the range of dates contained in the amended indictment. Scott claims "it cannot be said that a reasonable person could conclude that the [s]tate had proven beyond a reasonable doubt

that the [gross sexual imposition] offense was committed within the time frames alleged in the amended indictment." In support, Scott cites to a decision from this court, *State v. Blankenburg*, 197 Ohio App. 3d 201, 2012-Ohio-1289 (12th Dist.).

{¶38} In *Blankenburg*, this court stated that "[w]here crimes alleged in the indictment constitute sexual offenses against children, they need not state with specificity the dates of the alleged abuse, so long as the state establishes that the offense *was committed within the time frame alleged*." *Blankenburg* at ¶ 21, *citing State v. Wagers*, 12th Dist. Preble No CA2009-06-018, 2010-Ohio-2311, ¶ 17-18. (Emphasis added). Applying this holding, Scott claims that because P.W. testified the abuse began in May 2014, two weeks before her ninth birthday, the gross sexual imposition offense could have occurred before the time frame set forth in the amended indictment, and therefore, the state failed to carry its burden pursuant to *Blankenburg*.

{¶39} Ordinarily, precise times and dates are not essential elements of offenses. *State v. Sellards*, 17 Ohio St. 3d 216, 171 (1985). Thus, "[t]he failure to provide dates and times in an indictment will not alone provide a basis for dismissal of the charges." *Id.* "A certain degree of inexactitude of averments, where they relate to matters other than the elements of the offense, is not per se impermissible or necessarily fatal to a prosecution." *Id.*; *see also State v. Hoyt*, 12th Dist. Warren No. CA2015-10-089, 2016-Ohio-642, ¶ 16. Additionally, it is sufficient if it can be understood that the offense was committed at some time prior to the time of the filing of the indictment. *State v. Collinsworth*, 12th Dist. Brown No. CA2003-10-012, 2004-Ohio-5902, ¶ 22, citing *Sellards* at 171. Some Ohio courts have also recognized that "[t]he State is not required to prove that an offense occurred on any specific date, but rather may prove that the offense occurred on a date reasonably near that charged in the indictment." *State v. Miller*, 5th Dist. Licking No. 2006CA00030, 2006-Ohio-

6236, ¶ 22 (upholding appellant's conviction where the victim's testimony provided competent, credible evidence from which the jury could find appellant raped the victim on a date reasonably near the date claimed in the indictment); *Tesca v. State*, 208 Ohio St. 287 (1923), paragraph one of the syllabus ("It is sufficient to prove the alleged offense at or about the time charged").

{¶40} In sexual abuse cases involving children, this court has held that it may be impossible to provide a specific date in the indictment. *State v. Vunda*, 12th Dist. Butler Nos. CA2012-07-130 and CA2013-07-113, 2014-Ohio-3449, ¶ 36. The problem is compounded where the accused and the victim are related or reside in the same household, situations which often facilitate an extended period of abuse. *Id.* "'An allowance for reasonableness and inexactitude must be made for such cases.'" *State v. Birt*, 12th Dist. Butler No. CA2012-02-031, 2013-Ohio-1379, ¶ 32, quoting *State v. Barnes*, 12th Dist. Brown No. CA2010-06-009, 2011-Ohio-5226, ¶ 12. *See also Collinsworth* at ¶ 23 ("Under circumstances dealing with the memory of a child, reasonable allowances for inexact dates and times must be made").

{¶41} We acknowledge that there are some exceptions where dates and times are essential and the failure to provide specific dates and times may prejudice the accused. One such exception is where the accused asserts an alibi. *Wagers*, 2010-Ohio-2311 at ¶ 19. Likewise, where the age of the victim is an element of the crime charged and the victim bordered on the age required to make the conduct criminal, a specific date becomes essential and the failure to provide one is more likely to prejudice the accused. *Barnes* at ¶ 15.

{¶42} In *Sellards*, the Ohio Supreme Court noted that the absence of specifics must truly prejudice the accused's ability to fairly defend himself. *Sellards*, 17 Ohio St. 3d at 172.

- 13 -

Absent material detriment to the preparation of a defense, the omission of specific dates and times is without prejudice, and without constitutional consequence. *Id.* "If such is not fatal to an indictment, it follows that impreciseness and inexactitude of the evidence at trial is not per se impermissible or necessarily fatal to a prosecution." *State v. Robinette*, 5th Dist. Morrow No. CA-652, 1987 Ohio App. LEXIS 5996, *6 (Feb. 27, 1987) (upholding appellant's conviction for sexual battery where the evidence at trial did not reference the date alleged in the indictment, but was consistent with establishing the offense occurred on the date in question or within a reasonable time of those dates). Instead, "the central issue is whether the inaccurate allegation of the date of the crime was prejudicial to appellant." *State v. Morgan*, 6th Dist. Lucas, 2001 Ohio App. LEXIS 2104, *7 (May 11, 2001).

{¶43} In this case, the indictment alleged the gross sexual imposition offense occurred in the date range of on or about June 2, 2014 through June 10, 2015. According to the record, when P.W. initially reported the abuse to Mother, Richey at the Mayerson Center, and the social worker at Children's Hospital, she indicated the abuse began two weeks after her ninth birthday, which occurred on May 26, 2014. Nearly four years later, P.W. testified at trial that the first instance of abuse occurred just before her ninth birthday, and continued until "around" her tenth birthday. P.W. did not give any indication as to when Scott forced her to touch his penis, the basis of the gross sexual imposition charge, and only detailed that it occurred on one occasion. As discussed above, at the close of the state's case-in-chief, the trial court denied the state's motion to amend the indictment to expand the date range to conform with P.W.'s testimony. As a result of the trial court's decision to deny the state's motion and P.W.'s testimony at trial, there is a possibility that the gross sexual imposition offense occurred in May 2014, outside the date range set forth in the indictment.

{¶44} Pursuant to *Blankenburg* and *Wagers*, such a result could be insufficient, notwithstanding the fact that mid-May 2014 is "reasonably near" the June 2, 2014 date alleged in the indictment. However, upon reexamining this issue and our holdings in *Blankenburg* and *Wagers*, we agree with our sister court that "the central issue is whether the inaccurate allegation of the date of the crime was prejudicial to appellant," not whether the state proved that the allegation occurred in the time frame set forth in the indictment. *Morgan*, 2001 Ohio App. LEXIS 2104 at *7. Thus, contrary to the precedent set forth in *Blankenburg* and *Wagers*, we find the failure to prove an offense occurred during the time frame alleged in the indictment is only fatal to the state's claim where an accused would be prejudiced and otherwise denied a fair trial if the state were not required to establish that the date of an offense occurred within the identified range. Such a finding is consistent with the Ohio Supreme Court's holding in *Sellards*, as well as the general rule that dates and times are not essential elements of a crime.

{¶45} In the case sub judice, there is nothing in the record to indicate Scott or his defense was prejudiced by the state's lack of precision regarding the date on which the gross sexual imposition offense occurred. The record reflects that on May 17, 2017, Scott filed a Notice of Alibi, which indicated "he was not at the victim's residence during some or all of the dates set forth in the indictment." Scott did not amend his alibi defense after the state extended the dates of the offenses. At trial, Scott presented evidence that he resided with Father from March until October 2014 and was at Father's home every night between March 31, 2014 until late October 2014. Thus, in addition to claiming the sexual contact did not occur, Scott maintained at trial that he could not have committed the gross sexual imposition offense because he was not at Mother's home during that period. We note that Father's testimony therefore established an "alibi" for Scott that extended from March 2014

until October 2014, and encompassed the time P.W. testified the abuse began. Scott does not argue on appeal that he was prevented from presenting a different alibi or from developing additional defense theories as a result of P.W.'s testimony relating to abuse beginning in May 2014.

{¶46} When considering the above, and based on Scott's defense strategy at trial, we find Scott was not prejudiced by the state's failure to establish the offense occurred within the range set forth in the indictment. Furthermore, we find there is no prejudice or due process violation where Scott denied any sexual contact whatsoever with the victim. That is, merely because the evidence revealed the gross sexual imposition offense may have occurred in the month prior to the alleged time frame does not affect Scott's claim and defense that P.W.'s allegations were entirely false. Due to Scott's general denial and claim of innocence, the inaccurate allegation of the date of the crime in the indictment did not result in prejudice to his defense. Accordingly, because the state's error was without prejudice and without constitutional consequence, we find it was not fatal to the prosecution of Count 1.

{¶47} We also reject Scott's argument that his conviction is against the manifest weight of the evidence because P.W. was not a credible witness and there was no corroborating evidence to support her story. As discussed above, P.W. testified that Scott grabbed her hand and forced her to touch his penis. While P.W. indicated Scott frequently attempted to make her touch his penis, she testified she touched it on one occasion, and described it as feeling "slimy." P.W.'s testimony describing the sexual contact was consistent with the statements she gave to the Mayerson Center and the social worker from Children's Hospital. Moreover, the jury could have reasonably concluded that Scott acted as he did for the purpose of sexual gratification.

{¶48} "A jury is in the best position to take into account the witnesses' demeanor and thus to assess their credibility, and therefore is entitled to believe or disbelieve all, part, or none of the testimony of a witness." *State v. Freeze*, 12th Dist. Butler No. CA2011-11-209, 2012-Ohio-5840, ¶ 90. Moreover, "[t]here is nothing in the law that requires that a sexual assault victim's testimony be corroborated as a condition precedent to conviction." *State v. West*, 10th Dist. Franklin No. 06AP-111, 2006-Ohio-6259, ¶ 16. Therefore, because P.W.'s testimony, standing alone, was sufficient to prove Scott had sexual contact with P.W. when she was younger than 13 years old, Scott's argument lacks merit.

{¶49} In light of the above, we find the state met its burden of production regarding each element of gross sexual imposition. Accordingly, when viewing the evidence in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that Scott committed the crime of gross sexual imposition, and therefore, the trial court did not err in denying his Crim.R. 29 motion for acquittal. We similarly conclude the jury, in resolving the conflicts in the evidence, did not create a manifest miscarriage of justice so as to require a new trial and that Scott's conviction is not against the manifest weight of the evidence.

{¶50} Scott's first and second assignments of error are therefore overruled.

{¶51} Assignment of Error No. 3:

{¶52} THE TRIAL COURT'S SIXTY (60) MONTH PRISON SENTENCE IS NOT COMMENSURATE WITH THE SERIOUSNESS OF APPELLANT'S CONDUCT.

{¶53} In his remaining assignment of error, Scott argues that his sentence is not commensurate with the seriousness of his conduct. Therefore, Scott claims the 60-month sentence is contrary to law.

{¶54} We review the imposed sentence under the standard of review set forth in

R.C. 2953.08(G)(2), which governs all felony sentences. *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, ¶ 1; *State v. Crawford*, 12th Dist. Clermont No. CA2012-12-088, 2013-Ohio-3315, ¶ 6. Pursuant to that statute, an appellate court does not review the sentencing court's decision for an abuse of discretion. *Marcum* at ¶ 10. Rather, R.C. 2953.08(G)(2) compels an appellate court to modify or vacate a sentence only if the appellate court finds by clear and convincing evidence that "the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law." Id. at ¶ 1. A sentence is not clearly and convincingly contrary to law where the trial court "considers the principles and purposes of R.C. 2929.11, as well as the factors listed in R.C. 2929.12, properly imposes postrelease control, and sentences the defendant within the permissible statutory range." *State v. Ahlers*, 12th Dist. Butler No. CA2015-06-100, 2016-Ohio-2890, ¶ 8; *State v. Julious*, 12th Dist. Butler No. CA2015-12-224, 2016-Ohio-4822, ¶ 8. Thus, this court may "increase, reduce, or otherwise modify a sentence only when it clearly and convincingly finds that the sentence is (1) contrary to law or (2) unsupported by the record." *State v. Brandenburg*, 146 Ohio St.3d 221, 2016-Ohio-2970, ¶ 1, citing *Marcum* at ¶ 7.

{¶55} The purposes of felony sentencing are to protect the public from future crime by the offender and to punish the offender. R.C. 2929.11(A). A felony sentence must be reasonably calculated to achieve the purposes set forth in R.C. 2929.11(A) "commensurate with and not demeaning to the seriousness of the offender's conduct and its impact on the victim, and consistent with sentences imposed for similar crimes committed by similar offenders." R.C. 2929.11(B). In sentencing a defendant, a trial court is not required to consider each sentencing factor, but rather to exercise its discretion in determining whether the sentence satisfies the overriding purpose of Ohio's sentencing structure. *State v.*

*Littleton*, 12th Dist. Butler No. CA2016-03-060, 2016-Ohio-7544, ¶ 12.  The factors set forth in R.C. 2929.12 are nonexclusive, and R.C. 2929.12 explicitly allows a trial court to consider any relevant factors in imposing a sentence.  *Id.*

{¶56}  After a review of the record, we find no error in the trial court's decision to sentence Scott to 60 months in prison for his offense.   Without the existence of corroborating evidence, a conviction for third-degree gross sexual imposition under R.C. 2907.05(A)(4) subjects the offender to a maximum term of up to 60 months in prison.  R.C. 2929.14(A)(3). That is not a mandatory term, although there is a presumption that prison time will be served. R.C. 2907.05(C)(2).  And if the presumption is overcome, the court may impose a community-control sanction.  R.C. 2929.15.

{¶57}  At the sentencing hearing, the trial court noted that in order to overcome the presumption of prison in this case, it must find that "a nonprison sanction would adequately protect the public and punish Mr. Scott because factors indicating he's less likely to reoffend outweigh those that he's more likely.  And it would not demean the seriousness of the offense based on less serious factors potentially outweighing more serious factors."  The trial court then addressed the applicable factors:

> In terms of seriousness, the report indicates that the offense was more serious because of the physical or mental injuries suffered by the victim.  That the victim * * * was under 13 years of age[.]

> Although probation didn't point this out, one could - - the Court could surmise that the offender's relationship with the victim facilitated the offense, i.e., that they spent time in the same household, that the facts indicated and bore out that they were in the same bedroom on more than one occasion.

> In terms of less serious, probation indicates there is nothing in the factors which indicate that the offense is less serious relative to 2929.13(D)(2).

> In terms of recidivism, probation finds * * * that there's no

genuine remorse.

* * *

So in some respect, the Court could find - - the Court believes that you could still be remorseful and still maintain your innocence. That's not what occurred, but again, the Court's not going to split hairs here[.]

* * *

The Court will note that recidivism is less likely because you have not been adjudicated a delinquent child. * * * In terms of a record * * * looks like a reckless operation offense.

* * *

The Court will note that there's a presumption of prison. The Court will note that based upon the record and the pre-sentence investigative report that the Court cannot overcome the presumption of prison.

* * *

The Court finds that [P.W.'s] testimony and the jury found that that testimony was credible. The Court finds that this is a sex offense. The Court finds that she was at least under 13 years of age, if not younger.

The Court, noting the purposes and principals [sic] of felony sentencing under 2929.11 and 12 with the presumption of prison, is going to order a period of imprisonment, Mr. Scott, of 60 months.

The trial court later memorialized these findings within its sentencing entry.

{¶58} From the trial court's statements at the sentencing hearing and the language utilized in the sentencing entry, we find Scott's sentence is not clearly and convincingly contrary to law. On appeal, Scott claims his sentence was contrary to law because the trial court did not properly weigh the seriousness and recidivism factors under R.C. 2929.12. Specifically, Scott contends his conduct is less serious in that he did not cause physical harm to P.W. We disagree.

{¶59} The sentencing entry states that the trial court considered "the principles and purposes of sentencing under Ohio Revised Code section 2929.11, and has balanced the

- 20 -

seriousness and recidivism factors pursuant to Ohio Revised Code section 2929.12." Thus, the trial court properly considered the purposes and principles. We also find the trial court did not err in considering Scott's conduct more serious for sentencing purposes. As the trial court noted, Scott took advantage of his relationship with P.W., both as her caregiver and her mother's boyfriend, to facilitate the offense. Additionally, P.W. has exhibited long-term psychological harm as a result of Scott's conduct, including posttraumatic stress disorder, symptoms of avoidance, increased anger, hypervigilance, and somatic symptoms. When considering these facts, in addition to P.W.'s young age at the time of the offense and Scott's lack of remorse, we find the record clearly and convincingly supports the sentence imposed. As a result, despite Scott's claims otherwise, the trial court did not err by sentencing Scott to serve 60 months in prison after the jury found him guilty of gross sexual imposition. *See, e.g.*, *State v. Brooks*, 11th Dist. Trumbull No. 2015-T-0111, 2016-Ohio-4743 (upholding the maximum prison sentence for gross sexual imposition even though defendant had minimal criminal history and was at low risk to reoffend as defendant expressed no remorse for his actions, the victim was the defendant's young granddaughter, and the victim suffered psychological harm).

{¶60} Therefore, finding no error in the trial court's sentencing decision, Scott's third assignment of error is overruled.

{¶61} Judgment affirmed.

RINGLAND and M. POWELL, JJ., concur.