[Cite as *State v. Simmons*, 2021-Ohio-3563.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2020-10-069 |
| | : | O P I N I O N |
| - vs - | | 10/4/2021 |
| | : | |
| GRADY SIMMONS, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 19CR36155

David P. Fornshell, Warren County Prosecuting Attorney, and Kathryn M. Horvath, Assistant Prosecuting Attorney, for appellee.

Suhre & Associates, LLC, and Joseph B. Suhre IV, for appellant.

**S. POWELL, J.**

{¶ 1} Appellant, Grady Simmons, appeals his conviction in the Warren County Court of Common Pleas after a jury found him guilty of assaulting two corrections officers, M.H. and N.S., while Simmons was an inmate at the Warren Correctional Institution. For the reasons outlined below, we affirm Simmons' conviction.

**Facts and Procedural History**

{¶ 2} On November 12, 2019, the Warren County Grand Jury returned an indictment charging Simmons with two counts of assault in violation of R.C. 2903.13(A), both third-degree felonies in accordance with R.C. 2903.13(C)(3).[1] The charges arose after it was alleged Simmons caused physical harm to two corrections officers, M.H. and N.S., while Simmons was an inmate incarcerated at the Warren Correctional Institution on September 12, 2019. The record indicates Simmons was at that time incarcerated at the Warren Correctional Institution after being convicted of murder in 1991, assault in 1997, and felonious assault in 2009.[2]

{¶ 3} On November 27, 2019, a trial court magistrate entered a plea of not guilty on Simmons' behalf after Simmons refused to leave his cell for his arraignment hearing. After Simmons' not guilty plea was entered into the record, the trial court appointed Attorney John Kasper to represent Simmons in his defense.

{¶ 4} On December 19, 2019, Simmons filed a notice with the trial court setting forth his intent to proceed pro se. Specifically, Simmons stated within that notice that he "would like to exercise [his] right to defend myself on this above case," that he was "seeking a jury trial," that he was "not interested in any plea bargains" since he was "100% innocent of this charge," and that he wanted to "defend himself and prove with evidence" that he was innocent.

---

1. The offense of assault is usually charged as a first-degree misdemeanor in accordance with R.C. 2903.13(C)(1). However, pursuant to R.C. 2903.13(C)(3), assault is charged as a third-degree felony if: (1) the offense occurred in or on the grounds of a state correctional institution; (2) the victim of the offense was an employee of the department of rehabilitation and correction; and (3) the offense was committed by a person incarcerated in the state correctional institution.

2. Simmons was initially incarcerated within the Ohio Department of Rehabilitation and Correction on April 2, 1991, after he pled guilty to murder and was sentenced to an indefinite prison term of 15 years to life by the Cuyahoga County Court of Common Pleas. Simmons was later sentenced by the Richland County Court of Common Pleas to serve two additional prison terms: six months in prison on a charge of fourth-degree felony assault on July 14, 1997, with another two years in prison on a charge of second-degree felonious assault on April 23, 2009.

{¶ 5} On February 4, 2020, Simmons appeared before the trial court for another arraignment hearing to ensure that he had received a copy of the indictment and understood the nature of charges levied against him. During this hearing, the trial court asked Simmons if he wanted to be represented by an attorney. To this, Simmons responded, "Absolutely not." The trial court then advised Simmons that, although it was ultimately his decision whether to proceed pro se, "it's usually not a good idea." The trial court also explained to Simmons the difficulties that he could face by representing himself at trial.

{¶ 6} The trial court then reminded Simmons that he was facing two "serious charges" of third-degree felony assault, but that "if you still want to waive counsel, I will honor your request." Following this reminder, the trial court asked Simmons if he still wanted to represent himself, to which Simmons responded, "Yes, I do." The trial court then asked Simmons if he would at least like to have an attorney placed "on standby basis." Simmons responded, "No, I'm not interested in that." Simmons then read and signed a waiver of counsel form that had been provided to him by the trial court.

{¶ 7} Following still further discussion between Simmons and the trial court about the difficulties that he may face by proceeding pro se, Simmons stated:

> So why is it hard for me to defend myself? * * * I just want to exercise my right and have access to law libraries and everything else to defend myself. I got that right. Well, why is it so hard? I don't understand why it's so complicated for me to do this. * * * It would be easier if I took a plea bargain or have him [i.e., Attorney Kasper]. I don't want to do that.

{¶ 8} With Simmons' approval, the trial court then vacated Attorney Kasper's appointment as Simmons' attorney and scheduled the matter for a jury trial on April 30, 2020.

{¶ 9} On March 5, 6, 11, and 16, 2020, Simmons filed several motions with the trial court. These motions included an ex parte motion requesting the trial court appoint an

- 3 -

investigator, as well as a motion to continue the jury trial. In support of his motion to continue the jury trial, Simmons stated that a continuance was necessary so that he could "prepare his case" and "learn all of the rules and routines of criminal trial practice as not to offend and disrespect" the trial court's "honor." Simmons also stated that his "intention" was to prove his innocence, "show honor to the court, and prepare a strong defense," because he "love[s] and respect[s] law way too much to offend it in any way."

{¶ 10} On March 17, 2020, Simmons filed a motion requesting the trial court waive "any and every pretrial hearing." As part of this motion, Simmons reiterated that he was "representing himself," and that he was "not interested in co-counsel, or a public defender," or even "standby counsel (even though he cannot stop the court from providing/forcing that on him) * * *."

{¶ 11} On March 19, 23 and 25, 2020, Simmons filed several other motions with the trial court, including another motion for a continuance of the jury trial. In support of his newly filed motion to continue, Simmons argued that a continuance was necessary for the health and safety of all involved given the ongoing COVID-19 pandemic.

{¶ 12} On April 9, 2020, the trial court held a joint hearing on all of Simmons' various motions. During this hearing, the trial court noted that it would be granting Simmons' request to have the jury trial continued to September 14, 2020 given the ongoing COVID-19 pandemic, but that Simmons' other motions would either be denied outright or ruled upon once the matter proceeded to trial. This includes Simmons' ex parte motion requesting the trial court appoint him an investigator.

{¶ 13} The trial court then advised Simmons that rather than an investigator what he actually needed was to be appointed an attorney. To this, Simmons responded, "No, I don't want an attorney." Simmons also stated:

> Your Honor, I object to that because I have the right to defend

- 4 -

myself and – and if I'm asking the Court for assistance and a proper defense, I have the right to that. If I didn't have the right to that, then I would be forced an attorney [sic] but I have the right to defend myself.

{¶ 14} Continuing, Simmons stated:

I've already stated that I want to defend myself. I don't want co-counsel. I don't want an attorney. So I'm asking for an investigator to assist me. I'm defending myself. I just need him to assist me in collecting evidence, talking to different people about the case 'cause I'm innocent and I'm trying to prove that I'm innocent.

{¶ 15} The trial court then once again advised Simmons that it would be in his best interest to have an attorney appointed for him. To this, Simmons responded, "Your Honor, can we please not talk about me having an attorney? Can we please not talk about that, please?" The trial court then closed the hearing and scheduled the matter for a final pretrial hearing on September 3, 2020.

{¶ 16} On August 14, 2020, Simmons filed yet another motion to continue the jury trial. In this motion, just like in his previous motion to continue filed with the trial court on March 23, 2020, Simmons argued that a continuance was necessary given the still ongoing COVID-19 pandemic.

{¶ 17} On September 3, 2020, the trial court held the previously scheduled final pretrial hearing. Immediately after the hearing opened, the trial court addressed Simmons and reminded him that on "prior occasions we've had conferences and you have elected to proceed without counsel and we're going to go over that one more time before we go any further." Following this reminder, the trial court questioned Simmons about the extent of his education and his ability to read and write, to which Simmons responded, "I don't understand. I said I want to go pro se. I'm not taking any plea bargains. * * *."

{¶ 18} Shortly after this exchange, the trial court provided Simmons with another waiver of counsel form to sign. After providing Simmons with this form, the trial court read

- 5 -

the form to Simmons and, after each paragraph, asked Simmons if he understood the ramifications and potential downfalls of him proceeding pro se at trial. Each time Simmons responded to the trial court by stating, "Yes." Simmons also noted that the trial court had already "went over this [with him] 20 times" prior to him signing the same waiver of counsel form at his arraignment hearing held on February 4, 2020.

{¶ 19} The trial court then asked Simmons to use the pen in front of him to sign the waiver of counsel form. Simmons refused, noting that he did not want to "touch that pen" because of his concerns regarding the COVID-19 virus. Simmons still refused to use the pen in order to sign the waiver of counsel form even after the trial court requested the pen be wiped off with disinfectant. As Simmons stated, "You can wipe whatever you want to wipe off. I'm not signing that. I'm not touching it. I'm not touching anything." To this, the trial court responded and stated, "All right. That's fine."

{¶ 20} The trial court then addressed Simmons again and advised Simmons that although it was "against [his] wishes," that it was nevertheless appointing Attorney Kasper "as standby counsel and that's my decision." Simmons did not respond to the trial court notifying him that Attorney Kasper was being appointed as standby counsel. Later on in that hearing, however, Simmons made an oral motion to continue by claiming, for the first time, that he had "an investigator interested in taking the case and an attorney." Simmons also claimed that a continuance was necessary because he had "attorneys interested in the case and a few investigators" and that if he just had "a little bit more time" that he was "pretty sure" he could get both an attorney and an investigator to help him with his defense. Simmons further claimed that a continuance was necessary so that he could "come in here with a team," so that he does not "have to defend [himself]."

{¶ 21} Given that Simmons' most recent written motion for a continuance dealt only with issues regarding the ongoing COVID-19 pandemic, the trial court denied Simmons'

motion for a continuance he had filed with the trial court on August 14, 2020. The trial court did note, however, that if Simmons wanted to file another written motion requesting the jury trial be continued for reasons other than his concerns regarding the ongoing COVID-19 pandemic that he was certainly free to do so. The record indicates Simmons did not file any additional motion with the trial court requesting the jury trial be continued.

{¶ 22} On September 14, 2020, the previously scheduled jury trial began. Prior to the potential jurors entering the courtroom, the trial court made clear that Simmons' oral motion to continue the jury trial made at the final pretrial hearing held on September 3, 2020 was also being denied. As the trial court stated:

> For the record, the – when we were here last time, Mr. Simmons had requested a continuance. The reason that he gave – there's no further motion that's been filed, but he made an oral request for continuance on the basis of wanting to hire an investigator or a technician or something and – and to get counsel.
>
> We had just finished that morning waive – going through the waiver of right to counsel. And, in fact, Mr. Simmons was a little bit irritated with the Court because we'd gone over it, I think he said 10 times previously. He did – he did not – he refused to sign the acknowledgment of his rights to counsel. But we did go through it item-by-item on the record.

{¶ 23} Continuing, the trial court stated:

> The Court finds that on a previous occasion, this case had been scheduled for a jury trial [to begin on] April 30th. On April 9th, the Defendant did file a previous motion for continuance, based on COVID-19. That was granted and Mr. Simmons was – participated in selecting this date for [a] jury trial. * * * The second motion for continuance based on COVID-19 was denied.

{¶ 24} The trial court then stated:

> So the Court finds that any further request for a continuance on the basis of trying to hire counsel or otherwise, especially after he had just waived his right to counsel, are only for the purposes of delay and will not be – not be granted.

{¶ 25} The trial court then explained to Simmons how the trial proceedings would

- 7 -

begin, to which Simmons responded, "Let's get the show on the road."

{¶ 26} On September 14 and 15, 2020, the matter was tried to the jury. During this two-day trial, the jury heard testimony from a total of seven witnesses. This included testimony from the two victims, M.H. and N.S., as well as from Simmons himself. This also included testimony from an employee of the Warren Correctional Institution, Sergeant Jerry Gault. The jury also viewed video surveillance footage of the incident taken from three of the Warren Correctional Institution's security cameras. The following is a summary of the relevant testimony and evidence presented at that two-day jury trial.

**M.H.'s Testimony**

{¶ 27} M.H. testified that she was employed as a corrections officer working the second shift at the Warren Correctional Institution on the date in question, September 12, 2019. M.H. testified that she was stationed in the 2B housing unit on that date along with another corrections officer, N.S. M.H. testified that the 2B housing unit is "the education block." M.H. testified that this meant the schedules for the inmates housed within that unit were different from other inmates. M.H. testified that the inmates' schedules were kept in a binder located at the officer desk. M.H. testified that this binder also included the inmates' "dayroom schedule,"[3] as well as a list of the "porters for that housing block, and if they were first shift porter, second shift porter and what their duties were * * *."[4]

{¶ 28} M.H. testified that after entering the 2B housing unit to begin her shift that Simmons came up to the officer desk where she and N.S. were stationed and said, "I'm supposed to be second shift porter. I just want to make sure that you're cool that I stay out."

---

3. M.H. testified that the "dayroom" was a common area within the 2B housing unit where, on an alternating basis, a portion of the inmates housed within that unit would have time out of their cells to watch television, use the telephone, check their e-mail, and "take care of whatever business they have and to just enjoy some free time."

4. M.H. testified that the duties assigned to a porter included things like cleaning the showers, taking out the trash, and wiping down tables and the cell bars.

M.H. testified that she responded and told Simmons that she had worked in the 2B housing unit before and knew that Simmons was not a second shift porter, but was instead a first shift porter who should have been locked down in his cell. M.H. testified that Simmons then said to her, "well, what do you want me to do," because he was planning on staying out of his cell to cook food for himself in the dayroom. M.H. testified that she then asked Simmons how long he would need to cook his food. M.H. testified that Simmons replied, "about 10, 15 minutes." M.H. testified that she then told Simmons, "that's fine, cook your food. When you're done, let me know. I'll lock you down in your cell at that time." M.H. testified that Simmons responded, "okay."

{¶ 29} M.H. testified that approximately 30 seconds to one minute later Simmons came back up to the officer desk and asked her again if he could stay in the dayroom instead of being locked down in his cell. M.H. testified that she told Simmons, "that's not how I work. If you 're not a porter, if you're not supposed to be out, I don't have extra people out in the dayroom." M.H. testified that Simmons then "walked away," only to come back to the officer desk a few seconds later and start arguing with her. To this, M.H. testified that she told Simmons, "you just need to lock down," [y]ou're not going to stay out," "just grab your food and lock down." When asked how many times she told Simmons that he was not going to be staying out in the dayroom, M.H. testified "at least two or three times and I'm not sure if [N.S.] also reiterated what I said."

{¶ 30} M.H. testified that she then went around the officer desk and began walking towards Simmons' cell located towards the back of the dayroom. M.H. testified that during this time Simmons, who M.H. testified she had never had an issue with before, "said a couple times, I won't be disrespected." M.H. also testified that Simmons said, "I'll just go back to OSP." When asked what she took this to mean, M.H. testified that "OSP," which is an acronym for the Ohio State Penitentiary, is a level five maximum security prison unlike

the Warren Correctional Institution which is a level three close security prison.

{¶ 31} Explaining what happened next, M.H. testified:

> [Simmons] was walking behind me. He went to his table, grabbed his food, and then came up behind me. I'd already had – had his cell door open, open the door. He walked in. [N.S.] was behind him and [Simmons] got in his cell. [Simmons] very quickly turned around, threw his food on the floor and then just hit me.

{¶ 32} Describing this hit further, M.H. testified that Simmons struck her in the left side of face with a closed fist one time "so hard" that it knocked her to the ground and caused her to black out for "a couple seconds." M.H. then testified that once she regained consciousness that she stood back up and saw "Simmons standing over [N.S.] and having another inmate pull [Simmons] off of [N.S.] and pull [Simmons] into the shower area." M.H. testified that she then called for backup.

{¶ 33} M.H. testified that after calling for backup that she walked over to Simmons as he struggled to break free from the other inmate's grasp and pepper sprayed him in the face "quite a bit." M.H. testified that the other inmate, who she later realized was Simmons' cellmate, then let go of Simmons. M.H. testified she then watched as Simmons walked towards the drinking fountain on the other side of the dayroom. M.H. testified that she then followed Simmons towards the drinking fountain "with [her] pepper spray holding out, in case [Simmons] tried to come at [her and N.S.] again" because she "was afraid that if he had the ability, that he would do it again."

{¶ 34} M.H. then testified that once backup arrived she left and went "to medical, to get checked out." M.H. testified that after arriving at medical she met with multiple nurses, as well as the nursing supervisor. M.H. testified that she was then transported to a nearby hospital via ambulance for further evaluation. Photographs of M.H.'s injuries taken at the hospital show M.H. with swelling to the left side of her face, particularly around her eye,

cheek, and mouth. M.H. testified that over the next several days the left side of her face became even more swollen to the point where she could not open her left eye. Two photographs of M.H.'s injuries taken in the days and weeks after the incident corroborate M.H.'s testimony. M.H. testified that she later left her position as a corrections officer due to the physical and mental trauma this incident had caused her.

### N.S.'s Testimony

{¶ 35} N.S. testified that he was also employed as a corrections officer working the second shift at the Warren Correctional Institution on the date in question, September 12, 2019. N.S. testified that he was stationed in the 2B housing unit on that date along with his partner, M.H. N.S. testified that upon entering the unit he noticed Simmons was in the dayroom, an area where he knew Simmons was not supposed to be at that time. N.S. testified that he then stood by while M.H. had a conversation with Simmons about why he was in the dayroom when he should have instead been locked down in his cell. N.S. testified that he only heard "bits and pieces" of this conversation, but that M.H. never raised her voice at any time during her conversation with Simmons. N.S. testified that this was different from Simmons, who you could tell "was a little agitated" while M.H. was "explaining that – you know, you're not to be out currently. It's time to go lockdown."

{¶ 36} N.S. testified that he then assisted M.H. by escorting Simmons back to his cell. Explaining what happened while escorting Simmons to his cell, N.S. testified:

> Walked him back to his cell. My partner had went over and already unsecured the door, waiting for him to arrive at the cell. I was just letting him know that he will have an opportunity to come out for the next dayroom.
>
> We got to his cell. He had dropped his belongings at the door and turned around and struck my partner * * * at which point, I tried to gain control of the situation and draw attention to myself to deescalate the situation and get control.

{¶ 37} N.S. testified that he then tried to put Simmons up against the wall so that he

could place Simmons in handcuffs. N.S. testified that Simmons then "turned, faced [him], and started trying to strike." N.S. testified that Simmons was ultimately successful in getting "a couple of strikes in on [him] while [he] was attempting to create space" between him and Simmons so that he would "be able to get to a radio or something to deescalate the situation." N.S. testified that during this time M.H. was lying on the ground outside Simmons' cell where Simmons had struck her with a closed fist one time in "[h]er facial region." When asked where Simmons was able to strike him, N.S. testified that Simmons struck him multiple times on the left side of his face. N.S. testified that these blows to the face – which he estimated were at least three – eventually caused him to lose his balance, trip, and fall to the floor. N.S. testified that another inmate then stepped in and pulled Simmons away from him and M.H.

{¶ 38} N.S. testified that once the situation was diffused that he also went to medical to be examined. N.S. testified that he was then transported to the hospital via ambulance for further evaluation. Two photographs taken of N.S. shortly after this incident show some swelling and red marks on the left side of N.S.'s face, particularly on N.S.'s upper cheek and near his jaw area. N.S. testified that he did not have any other ongoing medical issues resulting from this incident except for the injuries that were observed in those two photographs. N.S. also testified that prior to the day in question, September 12, 2019, he had never had any issues with Simmons.

**Sergeant Gault's Testimony**

{¶ 39} Sergeant Gault testified that he too was employed at the Warren Correctional Institution on the date in question, September 12, 2019. Sergeant Gault testified that he contacted Simmons on that day to obtain a written statement regarding the incident involving him, M.H., and N.S. Sergeant Gault testified that the written statement he received from Simmons stated, in its entirety, "I fucked up and I'm sorry." Sergeant Gault also

testified that he did not see any injuries to Simmons' person when Simmons provided him with his written statement. The written statement Sergeant Gault obtained from Simmons, which was signed by Simmons, was subsequently published to the jury and admitted into evidence without objection.

**Simmons' Testimony**

{¶ 40} Simmons testified in his own defense.[5] Simmons testified that on the date in question, September 12, 2019, he approached the officer desk where M.H. and N.S. were stationed and explained to them that he was supposed to be both a first shift and a second shift porter. Simmons testified that he was not "mad" at this time, but that he was "just trying to explain that [he] was a porter" to M.H. and "it's not going anywhere." Simmons testified that M.H. then told him, "lock up," to which he responded, "man, this is crazy." Simmons testified that M.H. and N.S. then told him to get his belongings and go back to his cell.

{¶ 41} Simmons testified that he then turned and picked up his "food, little art supplies and stuff like that" before making his way toward his cell. Simmons testified that during this time that "everything's fine," that his "attitude's fine," and that he is in "perfect shape." Simmons testified that this all changed, however, when M.H. "gets that mace."

{¶ 42} Explaining what happened next, Simmons testified:

> Right here, I'm in the cell, she's saying something like, get in the cell. You don't want to get maced. So I'm like – you going – fuck, you say you gonna to do (sic) what to me? What you going to do? She said, you about to get maced. And before I knew it, boom.

{¶ 43} Simmons testified that he then started "going off" on both M.H. and N.S. in

---

5. Besides himself, Simmons called three other witnesses to testify in his defense. None of those three witnesses, however, testified about the assault. These three witnesses instead testified about the presence (or lack thereof) of injuries to Simmons' person that Simmons claimed were caused by officers at the Warren Correctional Institution as a form of retaliation for him causing physical harm to M.H. and N.S. Simmons later admitted on cross-examination that he had called these three witnesses in order to set the stage for an upcoming lawsuit that he planned to file in hopes of receiving a big monetary settlement.

order to stop M.H. from spraying him with pepper spray. Simmons then testified:

> Now, at this point right here, this is my [cellmate]. He said, oh – basically he's saying damn, [Simmons], what happened? He don't really know what happened. He – he really doesn't understand what's going on, but I'm on my – I had been like 11 years ticket free. I'm on my way home.

{¶ 44} Simmons testified that M.H. then came at him again with the pepper spray while he was "retreating." Simmons testified that M.H. should not have approached him with the pepper spray again because the "situation [was] done with," he had "already been sprayed once," and was "leaving" and "trying to get away." Simmons then testified

> Now, at this point, according to the laws of nondeadly force, she's attacking me. I did not have to stop. I did not have to run. I don't have to. With nondeadly force, you do not have to retreat. It's not like deadly force. * * * So I'm leaving. * * * You see me leave. * * * Look, I'm leaving. * * * Now I'm done. She's spraying me, but I'm walking away. I'm leaving. Why would you keep spraying me after I'm leaving? I'm no threat.

{¶ 45} Simmons also testified:

> Now, why are you chasing me? * * * Why are you chasing me down? * * * I'm in full stride. I'm leaving. I'm gone. I don't want any trouble. I'm retreating, even though, according to the laws of self-defense and the rules, I do not have to retreat. * * * I coulda turned around and stopped this. I'm being attacked again. So this is – the first time was over there. The second time, this is uncalled for. There's no need to chase me down with mace when I'm leaving. No. * * * Why is she chasing me? If I'm attacking you, why are you chasing me?

{¶ 46} Simmons further testified:

> [M.H.] comes in our branches and just – and if I wanted to fight somebody right then, that's when I would have went on ahead, and if – if I was trying to attack somebody, I had ample opportunity to attack their – the prosecution's claiming that I just went off the wall. I could attack then. See, rewind that back again to the – from the beginning. * * * You got two officers right there in front of my face. If I wanted to go crazy and bug out and throw a punch, I had plenty of time to do it. Remember, I'm a model prisoner. 11 years, no ticket, no conduct reports.

{¶ 47} Simmons additionally testified:

Nobody has to stand there like an idiot and – and you just spray – you just take them, allow them to spray you down like that. So I stopped it. The law says nondeadly force. I used nondeadly force with nondeadly force, so I committed no crime. There's no – there's no crime of assault. * * * If anything, I was assaulted by – with mace and I stopped it. If I would have been on the street and showed this video, I would say they attacked me. They assaulted me. Look, they weaponized that mace. I'm walking away.

{¶ 48} Once Simmons stopped testifying on direct, the state began its cross-examination of Simmons. This included the following exchange between Simmons and the state:

Q. You're serving a sentence for murder; is that right?

A. Yes.

Q. Okay. And you have said that you have been a model prisoner while you're in the institution; is that right?

A. Yes.

Q. But isn't it true you're also serving a sentence for assaulting a corrections officer out of Richland County from April 23rd of 2009?

A. Yes.

Q. So you would agree that you've had some issues while you've been in the institution?

A. Absolutely. It's prison.

{¶ 49} Simmons also testified on cross-examination that he "went into action" against M.H. because he saw M.H. reach for her pepper spray. Specifically, as Simmons testified:

When I seen the mace coming, I went into action. It still hit me, but not as much. So it was basically on me. If I hadn't had did (sic) that, it would've been a face shot. So I stopped that face shot. That was my objective is to stop that face shot, so I punched her in the face.

{¶ 50} The state then asked Simmons if he had struck M.H. again after she had gone

down to the ground.  Simmons responded, "Absolutely."

{¶ 51} The state then turned its cross-examination to questions related to N.S.  This included the state asking Simmons why he hit N.S. if he did not yet have his pepper spray out like he claimed M.H. did when he struck her.  Simmons responded that he felt "threatened" and that he was "in fear mode."  Simmons then testified:

> What got [N.S.] – listen.  I'm not going to lie to you.  You don't have to throw trick questions.  I'm going to tell you the truth.  When he came at me, I perceived a threat, so I just dropped it.  That was my thing, drop him. * * * So, yes, I – when he came at me, I dropped him.  What are you running up on me for?  I dropped him, absolutely.

{¶ 52} The following exchange between the state and Simmons then occurred:

> Q. So it wasn't self-defense against [N.S.]; is that correct?
>
> A. Now, see, that might be a tricky area because at this point, I got mace on me.  I don't know if he's going to spray mace, too.  It only makes sense.  It's only logical if one officer sprays you with mace, there's another.  He's coming.  That – that mace is coming. * * * Why [N.S] didn't spray me, it's a blessing.  I'm – I'm glad he didn't 'cause if he'd pulled that mace – I'd beat his head into the ground.  I'd beat him.  I'd a whooped him –
>
> Q. Just like you –
>
> A. – even worse than that.
>
> Q. Just like you did to [M.H.], right?
>
> A. Absolutely.  What – you see the video.  I'm telling you that when she came at me with that mace, I punched her in the fucking face.  I punched her in the face.  I'm not lying about this. * * * But I had a right to punch her in the face.

{¶ 53} Following the state's cross-examination of Simmons, the trial court asked the jury if they had any questions for Simmons.  One of the jurors asked Simmons how many times he had been in trouble since initially being sent to prison in 1991.  Simmons responded, "A lot.  A lot."  Simmons then explained that this included time he had previously spent at the Southern Ohio Correctional Facility where he "had to fight" because if "you was

- 16 -

not fighting, you was sucking some dick or you was getting your commissary, took anything you get." Simmons also explained that "back in the day" that "[y]ou had to stand on your own. You didn't have any support system. You had to go at it. So I went at it." Simmons further explained that he "absolutely" got in trouble while in prison, but that after he "established" himself that he "didn't have to be in warrior mode. So [he] went like 11 years –" without getting in trouble.

**Jury's Guilty Verdict and Trial Court's Sentence**

{¶ 54} Following the trial court's final jury instructions, and after deliberating for less than an hour, the jury returned a verdict finding Simmons guilty as charged. The trial court immediately proceeded to sentencing and sentenced Simmons to serve an additional 60 months in prison consecutive to his current term of incarceration. The trial court also notified Simmons that, as a result of this conviction, he would be subject to a mandatory three-year postrelease control term upon his release from prison. Simmons now appeals his conviction, raising four assignments of error for review.

**Appeal**

{¶ 55} Assignment of Error No. 1:

{¶ 56} THE TRIAL COURT VIOLATED SIMMONS' SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO COUNSEL WHEN IT FAILED TO ALLOW SIMMONS TIME TO SECURE COUNSEL.

{¶ 57} In his first assignment of error, Simmons argues the trial court erred when it denied his oral motion to continue the jury trial to allow him time to secure counsel he made at the final pretrial hearing held on September 3, 2020. Simmons also argues the trial court erred when it failed to have him sign another written waiver of counsel form immediately prior to when the jury trial began on September 14, 2020. We disagree with both of Simmons' claims.

{¶ 58} "A trial court has broad discretion in determining whether to grant or deny a continuance." *State v. Bullock*, 12th Dist. Clermont No. CA2005-04-031, 2006-Ohio-598, ¶ 12, citing *State v. Unger*, 67 Ohio St.2d 65, 67 (1981). This court will not reverse the trial court's decision to deny a defendant's motion for a continuance absent an abuse of that discretion. *State v. Glowka*, 12th Dist. Butler No. CA2012-10-203, 2013-Ohio-3080, ¶ 8. An abuse of discretion "connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, ¶ 181. "A decision is unreasonable where a sound reasoning process does not support it." *State v. Miller*, 12th Dist. Butler No. CA2016-01-007, 2016-Ohio-7360, ¶ 7, citing *AAAA Ents., Inc. v. River Place Community Urban Redev. Corp.*, 50 Ohio St.3d 157, 161 (1990).

{¶ 59} Unfortunately, there is no "bright-line test" for determining whether a motion for a continuance should be granted. *State v. Robinson*, 12th Dist. Butler No. CA2015-01-013, 2015-Ohio-4533, ¶ 19. However, while there is no "bright-line test," the Ohio Supreme Court has set forth several factors as guidance for the trial court when considering whether a continuance should be had. *State v. Toles*, 12th Dist. Madison No. CA2019-07-018, 2020-Ohio-4267, ¶ 24. These factors include, but are not limited to, "the length of the requested delay, whether other continuances have been requested and received, the inconveniences likely to result, the reasons for the delay, and whether the defendant contributed to the circumstances giving rise to the need for delay." *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, ¶ 18.

{¶ 60} As noted above, Simmons initially argues the trial court erred when it denied his motion for a continuance to allow him time to secure counsel that he made at the final pretrial hearing held on September 3, 2020. To support this claim, Simmons argues the trial court should have granted his motion, or, at the very least, "revisited having Simmons

- 18 -

sign away his right to be represented," rather than "simply writing it off as an attempt to delay." We disagree.

{¶ 61} As a simple review of the record reveals, Simmons unambiguously and unequivocally rejected the trial court's repeated efforts to appoint an attorney who could represent Simmons both before and during trial. This occurred over many months, and many hearings, to the point where Simmons became irritated when the trial court asked him to sign another waiver of counsel form after having already gone "over this [with him] 20 times." This is in addition to Simmons telling the trial court at a prior hearing, "I've already stated that I want to defend myself. I don't want co-counsel. I don't want an attorney," before asking, "Your Honor, can we please not talk about me having an attorney? Can we please not talk about that, please?"

{¶ 62} Given these facts, for Simmons to now claim it was error for the trial court to deny his motion for a continuance to allow him time to secure counsel that he made at the final pretrial hearing is nothing short of absurd and, just as the trial court found, a clear attempt by Simmons to delay the proceedings. This holds true even though it was Simmons' first time requesting a continuance to allow him time to secure counsel. Simmons, with full knowledge of the challenges that he could, and most likely would, face by proceeding pro se at trial, got exactly what he told the trial court that he wanted – the chance to defend himself and prove that he was innocent. Simmons' first argument lacks merit.

{¶ 63} Simmons also argues the trial court erred when it failed to have him sign another written waiver of counsel form immediately prior to when the jury trial began on September 14, 2020. Simmons supports this claim by citing Crim.R. 44(C), which provides that "[w]aiver of counsel shall be in open court and the advice and waiver shall be recorded

as provided in Rule 22. In addition, in serious offense cases the waiver shall be in writing."[6] We again disagree.

{¶ 64} While the express language found in Crim.R. 44(C) does require a defendant's waiver of counsel to be made in open court, the advice and waiver be recorded, and, in serious offenses cases, be done in writing, nowhere within that rule does it require the trial court to have the defendant sign another written waiver of counsel form immediately prior to when the defendant's trial is scheduled to begin. This makes sense, particularly under the facts of this case, given that Simmons had unambiguously and unequivocally rejected the trial court's repeated efforts to appoint him an attorney in the months leading up to trial, as well as Simmons' refusal to sign another waiver of counsel form, or even touch the pen that was provided to him, at the final pretrial hearing held on September 3, 2020. That is to say nothing of the fact that Simmons responded to the trial court, "Let's get the show on the road," after the trial court explained how the trial proceedings would begin. Therefore, despite Simmons' claims, requiring Simmons to sign another waiver of counsel form immediately prior to when the jury trial began was unneeded and would have constituted an unnecessary waste of the trial court's time. Simmons' second argument also lacks merit.

{¶ 65} In light of the foregoing, and having found no merit to either of the two arguments raised by Simmons within his first assignment of error, Simmons' first assignment of error lacks merit and is overruled.

{¶ 66} Assignment of Error No. 2:

{¶ 67} THE TRIAL COURT ERRED IN ALLOWING CHARACTER EVIDENCE WITHOUT GIVING THE JURY A PROPER LIMITING INSTRUCTION.

---

6. Pursuant to Crim.R. 2(C), all felony offenses are considered "serious offenses" for purposes of Crim.R. 44(C).

{¶ 68} In his second assignment of error, Simmons argues the trial court committed plain error by allowing the state to ask him whether, in addition to the time he was serving on his 15-years-to-life prison sentence for murder, he had been sentenced to serve additional prison time for assaulting another corrections officer by the Richland County Court of Common Pleas on April 23, 2009. Simmons claims that allowing the state to question him about this earlier assault of a corrections officer violated Evid.R. 404(B), a rule that "categorically bars the use of other-acts evidence to show propensity." *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, ¶ 21. We disagree.

{¶ 69} As the record plainly shows, the state questioned Simmons about this earlier conviction only after Simmons opened the door to the introduction of this evidence by testifying, on multiple occasions, that he was a "model prisoner" who had not received any "tickets" or "conduct reports" in the 11 years prior to the incident involving M.H. and N.S. It is well established that "[i]f the accused puts his character at issue," which is exactly what Simmons did here, "the state may offer evidence of the accused's bad character." *State v. Russell*, 12th Dist. Butler No. CA2012-03-066, 2013-Ohio-1381, ¶ 56; *see* Evid.R. 404(A)(1) ("[e]vidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same is admissible"); *see also* Evid.R. 405(B) ("[i]n cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct").

{¶ 70} Despite this, Simmons argues the trial court should have at least "instructed the jury on its limited use." But, as the record indicates, Simmons did not request a limiting instruction as it relates to this evidence, nor do we believe a limiting instruction was necessary under these circumstances given that "such evidence can in fact come in substantively." *State v. Bozeman*, 12th Dist. Butler No. CA2008-10-248, 2009-Ohio-3677, ¶ 45; *see, e.g., State v. Velez*, 3d Dist. ¶ 125 (trial court did not err by failing to instruct the

jury on "how to handle" evidence of appellant's character where that evidence was properly admissible as substantive evidence under Evid.R. 404[A][1], thereby eliminating the need for the trial court to provide the jury with a limiting instruction). Therefore, finding no merit to any of the arguments raised by Simmons within his second assignment of error, Simmons' second assignment of error also lacks merit and is overruled.

{¶ 71} Assignment of Error No. 3:

{¶ 72} SIMMONS' CONVICTIONS ARE NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 73} In his third assignment of error, Simmons argues his conviction for two counts of third-degree felony assault was against the manifest weight of the evidence. We disagree.

{¶ 74} A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14, citing *State v. Wilson*, 12th Dist. Warren No. CA2006-01-007, 2007-Ohio-2298, ¶ 34. "To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Morgan*, 12th Dist. Butler Nos. CA2013-08-146 and CA2013-08-147, 2014-Ohio-2472, ¶ 34, citing *State v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66. This court "will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal." *State v. Kaufhold*, 12th Dist. Butler No. CA2019-09-148, 2020-Ohio-3835, ¶

10, citing *State v. Blair*, 12th Dist. Butler No. CA2014-01-023, 2015-Ohio-818, ¶ 43.

{¶ 75} Simmons argues his conviction for two counts of third-degree felony assault was against the manifest weight of the evidence given his testimony that he was acting in self-defense when he caused physical harm to the two victims, M.H. and N.S. The jury, however, was presented with two conflicting versions of the events depicted in the video surveillance footage taken of the incident: one from the two victims, M.H. and N.S., and one from Simmons himself. Given its verdict, the jury clearly chose to believe M.H.'s and N.S.'s testimony regarding the assault and not the testimony offered by Simmons. This was well within the jury's purview as the trier of fact and ultimate factfinder. *See, e.g., State v. Pittman*, 9th Dist. Summit No. 29705, 2021-Ohio-1051, ¶ 19 ("[t]he jury was free to find [appellant's] testimony regarding self-defense not credible, and instead believe the State's version of the events").

{¶ 76} "[T]he jury did not have to accept [Simmons'] claim of self-defense simply because he asserted the defense at trial." *State v. Moore*, 12th Dist. Fayette No. CA2020-09-016, 2021-Ohio-1856, ¶ 18; *State v. Jones*, 8th Dist. Cuyahoga No. 108371, 2020-Ohio-3367, ¶ 85 ("[t]he fact that [appellant] testified concerning his affirmative defense of self-defense does not mean that the jury had to believe him"). This is particularly true here when considering the written statement Simmons provided to Sergeant Gault shortly after the incident occurred, wherein Simmons admitted that he "fucked up" and that he was "sorry." Therefore, because a conviction is not against the manifest weight of the evidence merely because the jury believed the testimony and evidence presented by the state, Simmons' conviction for two counts of third-degree felony assault was not against the manifest weight of the evidence. *See State v. Lunsford*, 12th Dist. Brown No. CA2010-10-021, 2011-Ohio-6529, ¶ 17. Accordingly, finding no merit to any of Simmons' arguments within his third assignment of error, Simmons' third assignment of error lacks merit and is overruled.

{¶ 77} Assignment of Error No. 4:

{¶ 78} THE TRIAL COURT ERRED IN SENTENCING SIMMONS TO CONSECUTIVE PRISON SENTENCES.

{¶ 79} In his fourth assignment of error, Simmons argues the trial court erred by imposing consecutive sentences, thereby sentencing him to serve a total, aggregate sentence of an additional 60 months in prison consecutive to his current term of imprisonment. We disagree.

{¶ 80} This court "does not review the sentencing court's decision for an abuse of discretion." *State v. Scott*, 12th Dist. Clermont Nos. CA2019-07-051 and CA2019 07-052, 2020-Ohio-3230, ¶ 54, citing *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, ¶ 10. "It is instead the standard of review set forth in R.C. 2953.08(G)(2) that governs all felony sentences." *State v. Watkins*, 12th Dist. Preble No. CA2020-03-005, 2021-Ohio-163, ¶ 48, citing *State v. Crawford*, 12th Dist. Clermont No. CA2012-12-088, 2013-Ohio-3315, ¶ 6; and *State v. Julious*, 12th Dist. Butler No. CA2015-12-224, 2016-Ohio-4822, ¶ 8 ("[a]s with all felony sentences, we review this sentence under the standard of review set forth in R.C. 2953.08[G][2]"). The standard prescribed by R.C. 2953.08(G)(2) is, in fact, "the only standard applicable to felony sentencing * * *." *State v. Paul*, 12th Dist. Clinton No. CA2020-08-010, 2021-Ohio-1628, ¶ 9, fn.1.

{¶ 81} Pursuant to R.C. 2953.08(G)(2), this court may increase, reduce, "or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing," if this court clearly and convincingly finds either of the following:

> (a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;

- 24 -

(b) That the sentence is otherwise contrary to law.

{¶ 82} "R.C. 2953.08(G)(2) is unambiguous and definite." *Marcum* at ¶ 9. "R.C. 2953.08(G)(2)(a) does not authorize an appellate court to review *any* and *all* findings of the trial court made during sentencing." (Emphasis sic.) *State v. Sallis*, 12th Dist. Clermont No. CA2019-12-092, 2020-Ohio-3924, ¶ 6. Rather, "and according to the plain language of the statute, the only findings this court has authority to review are those the trial court makes specific to R.C. 2929.13(B) or (D), R.C. 2929.14(B)(2)(e) or (C)(4), or R.C. 2929.20(I)." *Id.* at ¶ 7. "Therefore, 'because R.C. 2953.08(G)(2)(a) specifically mentions a sentencing judge's findings made under R.C. 2929.14(C)(4) as falling within a court of appeals' review, the General Assembly plainly intended R.C. 2953.08(G)(2)(a) to be the exclusive means of appellate review of consecutive sentences.'" *State v. Boyd*, 12th Dist. Butler No. CA2020-01-012, 2020-Ohio-4180, ¶ 12, quoting *State v. Gwynne*, 158 Ohio St.3d 279, 2019-Ohio-4761, ¶ 284. This is because "an appellate court has only the authority to review sentences in the manner proscribed by statute." *Sallis* at ¶ 12, citing *State v. Williams*, 148 Ohio St.3d 403, 2016-Ohio-7658.

{¶ 83} Pursuant to R.C. 2929.14(C)(4), a trial court must engage in a three-step analysis and make certain findings before imposing consecutive sentences. *State v. Blair*, 12th Dist. Butler No. CA2014-01-023, 2015-Ohio-818, ¶ 52. First, the trial court must find a consecutive sentence is necessary to protect the public from future crime or to punish the offender. *State v. Dillon*, 12th Dist. Madison No. CA2012-06-012, 2013-Ohio-335, ¶ 9. Second, the trial court must find that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. *State v. Heard*, 12th Dist. Butler Nos. CA2014-02-024, CA2014-02-025, and CA2014-05-118, 2014-Ohio-5394, ¶ 10. Third, the trial court must find that at least one of the three circumstances listed in R.C. 2929.14(C)(4)(a) thru (c) applies. *State v. Liming*, 12th Dist.

Clermont Nos. CA2018-05-028 and CA2018-05-029, 2019-Ohio-82, ¶ 25. Those three circumstances are:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 84} Simmons does not dispute that the trial court made the necessary consecutive sentence findings under R.C. 2929.14(C)(4) prior to imposing its sentencing decision. Simmons instead argues the trial court erred by finding the record supported the imposition of consecutive sentences when considering he "had gone more than a decade in prison without any disciplinary tickets" and, while acknowledging that he "may have acted out against two people," he did so "under the belief" that he was acting in self-defense "to protect himself from an ongoing assault." Despite Simmons' claims, however, we find the record contains extensive evidence to support the trial court's decision to impose consecutive sentences in this case.

{¶ 85} Simmons, while an inmate incarcerated at the Warren Correctional Institution, assaulted two corrections officers, M.H. and N.S., for seemingly no other reason than his displeasure for being told he could no longer be out in the dayroom. As Simmons' readily admitted, this was the second time in which he had been convicted of assaulting a corrections officer while incarcerated since he was first imprisoned after being convicted of

murder in 1991. This holds true even though Simmons claims he assaulted M.H. and N.S. in self-defense for it is clear the jury found the state had met its burden of proof requiring it to prove Simmons did not act in self-defense beyond a reasonable doubt. *See* R.C. 2901.05(B)(1). Therefore, finding no merit to any of the arguments raised by Simmons within his fourth assignment of error, Simmons' fourth assignment of error lacks merit and is overruled.

## Conclusion

{¶ 86} For the reasons outlined above, and finding no merit to any of Simmons' arguments raised herein, Simmons' conviction for assaulting two corrections officers, M.H. and N.S., while he was an inmate incarcerated in the Warren Correctional Institution is affirmed.

{¶ 87} Judgment affirmed.

M. POWELL, P.J., and BYRNE, J., concur.