[Cite as *State v. Perry*, 2023-Ohio-3106.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2023-01-004 |
| | : | O P I N I O N |
| - vs - | | 9/5/2023 |
| | : | |
| CASEY M. PERRY, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2022 CR 0331

Mark J. Tekulve, Clermont County Prosecuting Attorney, and Nicholas A. Horton, Assistant Prosecuting Attorney, for appellee.

W. Stephen Haynes, Clermont County Public Defender, and Robert F. Benintendi, Assistant Public Defender, for appellant.

**S. POWELL, P.J.**

{¶ 1} Appellant, Casey M. Perry, appeals his conviction in the Clermont County Court of Common Pleas after he pled guilty to one count of first-degree felony kidnapping, one count of second-degree felony felonious assault, one count of fourth-degree felony

domestic violence, and two firearm specifications, for which he was sentenced to serve a total, aggregate sentence of 15 to 17-and-one-half years in prison. For the reasons outlined below, we affirm Perry's conviction.

{¶ 2} On April 7, 2022, the Clermont County Grand Jury returned a six-count indictment charging Perry with two counts of first-degree felony kidnapping, two counts of second-degree felony felonious assault, one count of third-degree felony abduction, and one count of fourth-degree felony domestic violence. A three-year firearm specification was also attached to all six counts. The charges arose after Perry brutally beat his wife, Jane, during a lengthy, seven-hour altercation that took place at their Clermont County, Ohio home on the night of March 30, 2022 and early morning hours of March 31, 2022.[1] There is no dispute that Perry had a firearm with him during this altercation, which Perry discharged into the garage floor after telling his wife that she was going to watch him "blow his head off." The bill of particulars indicates that Perry was taken into custody after he attempted to flee by jumping out of his home's second story window. The bill of particulars also indicates that when asked by police what happened, Perry angrily replied, "My wife fucked my best friend."[2]

{¶ 3} On April 13, 2022, Perry appeared at his arraignment and entered a not guilty

_____

1. For purposes of this opinion, and to protect her privacy, we will refer to Perry's wife, the victim in this case, as "Jane" rather than by her real name or initials. The injuries that Perry inflicted upon Jane's person were significant and included severe bruising, including to the back of her head, two black eyes, lacerations to her face, a multitude of internal injuries, as well as cracked teeth, all of which resulted in Jane's hospitalization for a period of four days. Photographs of the injuries Perry caused to Jane's person are included in the record. The record indicates Jane also suffered real, easily identifiable emotional harm and mental anguish because of Perry's abhorrent and inexcusable actions.

2. Infidelity, whether real or imagined, is no excuse for what Perry did to Jane in this case. There is, in fact, no excuse for Perry's actions whatsoever. Nevertheless, as background, we note that the record indicates, and Jane readily admits, that a one-night stand between her and Perry's best friend did take place. However, the record also indicates that this one-night stand happened several years earlier, in 2018, while Perry was vacationing in Thailand with his then wife. Thus, as Jane later commented at Perry's sentencing hearing, although she and Perry were at that point "talking," they "obviously * * * weren't exclusive." The record further indicates that Perry had himself admitted to being unfaithful to Jane just prior to Jane disclosing her one-night stand to Perry, and, as noted in Jane's victim impact statement, "that's when [Perry] lost it and the instant offense occurred."

plea to all six counts, and their accompanying firearm specifications. Several months later, Perry entered into a plea agreement with the state. This plea agreement required Perry to plead guilty to one count of first-degree felony kidnapping, one count of second-degree felony felonious assault, and one count of fourth-degree domestic violence, along with two firearm specifications, in exchange for the remaining three counts and four firearm specifications being dismissed. This plea agreement also included the parties' agreeing that the state would recommend the trial court set a sentencing cap of 20 years in prison. This is in addition to the parties' agreeing that the state would recommend the trial court sentence Perry to 12 years in prison, with the potential for Perry to serve an additional four years dependent upon his behavior while in prison during those first 12 years. The plea agreement was memorialized in writing on two change of plea forms, both of which Perry reviewed with his defense counsel and signed.

{¶ 4} On October 26, 2022, the trial court held a change of plea hearing. Upon opening this hearing, the trial court noted that Perry had entered into the aforementioned plea agreement with the state. This included the trial court addressing the parties and having the following exchange with the state:

> And then the State has put in writing that they're recommending a cap, meaning that altogether these offenses would carry more than 20 years, but you're capping it. Which its effect, so Mr. Perry understands, is, not that I would want to, but if I wanted to go over that, I couldn't because you're asking me to commit to nothing over that. And then the minimum – I don't know what the minimum is.

{¶ 5} The state responded, noting that the minimum sentence Perry faced was six years in prison "with the gun specifications." The state then advised the trial court that it was also "going to make a recommendation at sentencing, so long as everything gets to that point, of an incarceration of 12 years." The state noted, however, "that will only be the State's recommendation, knowing that the victim is going to make a different

- 3 -

recommendation." The trial court then turned to Perry and asked, "Does that all sound right, Mr. Perry?" Perry responded, "Yes, sir."

{¶ 6} Satisfied with Perry's response, the trial court then asked Perry a series of questions about himself and his understanding of the proceedings. This included the trial court asking Perry if anybody had promised him "anything special" other than what had just been discussed. To this, Perry stated, "No." This also included the trial court confirming with Perry that he understood the maximum sentence he faced for each of the three offenses and two firearm specifications that he had agreed to plead guilty. This includes, for example, the trial court asking Perry:

> All right. So on the felonious and the kidnapping, let's go back to that. Just so you know, from a definite part or from a minimum sentence, the maximum you could serve on the felonious assault and the kidnapping, without the gun specification, is – eight is the maximum on the felonious assault. Eleven is the maximum on the kidnapping. That's 19 years. You understand that?

Perry responded, just as he had done before, "Yes, sir."

{¶ 7} Again, satisfied with Perry's responses, the trial court then advised Perry of the rights he would be waiving by pleading guilty. Upon being so advised, Perry entered his guilty pleas to the single counts of first-degree felony kidnapping, second-degree felony felonious assault, fourth-degree domestic violence, and two firearm specifications. The trial court accepted Perry's guilty pleas upon finding his pleas had been knowingly, intelligently, and voluntarily made. After making this finding, the trial court then scheduled the matter for a sentencing hearing to take place approximately two months later, on December 22, 2022. A presentence-investigative report was then prepared and submitted to the trial court for review. The presentence-investigative report includes a list of Perry's prior criminal activity as an adult. This included Perry being convicted of fifth-degree felony obstructing official business, first-degree misdemeanor unlawful sexual conduct with a minor, assault, and

operating a motor vehicle while under the influence, and second-degree misdemeanor resisting arrest and criminal damaging.

{¶ 8} On December 22, 2022, the trial court held the scheduled sentencing hearing. During this hearing, the trial court heard statements from both Perry and Perry's wife, Jane. This included Jane describing the torture she endured during that seven-hour altercation with Perry as follows:

> But really it's just when you love someone so deeply and their eyes and words were like your safe place and now all I can think about is him sitting overtop of me, the eyes I used to feel so safe in now terrify me. The words I heard, you know, throughout the night like, "Oh, don't worry, I'm going to kill you nice and slow and I'm going to kill myself and we'll be together forever." And "You really think I care about your family?" every time I would plead to leave. It's just really; it's really hard to comprehend for me like we were always each other's biggest support. * * * And just something that happened many years prior to cause this is very upsetting.

{¶ 9} This is in addition to Jane stating:

> But during the night when everything happened it was just, it was nonstop. It was… he was constantly on top of me. And every time it was kidney blows it was like, "That hurts, don't it. I know what that feels like." And it was if I tried to get up it was upper cuts to the stomach. If I tried to crawl away that's when my head got bashed into the fireplace eight times. When I started crawling away after him that's when he put me in a headlock, wrapped his ankles around mine and pulled up until I went unconscious. The hospital stated that I had to have been unconscious for at least 20 minutes because my organs already started shutting down by the time I got there. When I did wake up he was just sitting overtop of me with a smile saying, "Oh, I'm so glad you came back" and then went right back to it.

{¶ 10} The trial court also heard comments from the state in response to the references made to Perry's good character during mitigation. This included the state noting, in pertinent part, the following:

> A lot was said about [Perry's] character [during mitigation] and I think it's important that we highlight those. * * * Not only did he have a prior conviction for domestic violence, incidents with his

ex-wife, but during this event [Perry] threatened to kill [Jane] multiple times. He also threatened to kill himself. [Perry] was laughing and smiling while repeatedly hitting the victim over and over, Your Honor. He asked her after hitting her in the kidneys multiple times, "How do those kidneys feel?" He said to her, "I'll kiss us both, aren't we soulmates?" She begged him for her to [be] able to leave and in return he punched her in the stomach. He strangled her until she lost consciousness. Your Honor, at this point, after [Jane] had lost consciousness, [Perry] didn't go seek help, seek medical attention. No, he sat and stayed in the room while she was unconscious. At no time did he try to get medical aid for her. And I think that speaks extremely to his character.

{¶ 11} The trial court heard further comments from Jane's own attorney. This included Jane's recommendation that Perry be sentenced to the full, agreed upon 20-year maximum capped prison sentence. In so doing, Jane's counsel stated:

> Your Honor, this was, I mean I've been in training for a long time, you know that, this is very horrible. I mean seven hours of torture. And it wasn't that it was just torture, from what I hear from her, what she's told me repeatedly, he enjoyed it. He was smiling during it. Saying, "How does that feel?" I mean he chokes her unconscious, does nothing about it. And she wakes up and he's sitting there smiling, says, "Oh, I'm glad you woke up." I mean this is beyond horrendous. I mean what she went through was terrible but the fact that she sees someone that she trusted so much to do these types of behaviors. You know, 12 years is not enough. * * * She has severe anxiety, PTSD. She still has blackouts, nightmares. Days that she recluses herself in her apartment. Her biggest fear is he's going to come out of prison and he's going to come after her. * * * [That is why,] Your Honor, we're asking that you give him 20 years max him at the cap that was agreed to.

{¶ 12} After addressing other ancillary matters, which included the forfeiture of Perry's various firearms and ammunition, the trial court then set forth the factors it considered relevant when making its sentencing decision. This included the trial court noting that it was going to impose a sentence that it deemed "appropriate" under these circumstances. The trial court noted that it would do this after listening to "all of it" and considering what sentence Perry had recommended, what sentence the state had

recommended, and what sentence the victim, Jane, had recommended. The trial court then noted its considerations related to Perry and the likelihood of recidivism. Specifically, when addressing this factor, the trial court stated:

> In terms of whether it's more likely or not, these are just factors, no one knows for sure. That you've been in the system before, that you've had opportunities, although you haven't been in for something like this, to kind of pull your life together and yet you're back in the system. So, the factor indicates that you're more likely to commit an offense in the future than less, because what you've been through before didn't get you on the straight and narrow, these are my words, not the statute's. That you've had opportunities at rehabilitation. And because you're in the system again, one then can, can determine that you haven't responded favorably to those prior sanctions. The idea, Mr. Perry, is that when you get in trouble that the sanctions you suffer then make you then become a normal, ordinary, responsible person who got in trouble and then we don't see you anymore. And that hasn't happened in this case. And that's why they say it's more likely that you'll commit offenses in the future.

{¶ 13} The trial court then issued its decision to sentence Perry to serve a total, aggregate sentence of 15 to 17 and one-half-years in prison, less 262 days of jail-time credit. In so doing, the trial court noted that it had ordered the five-year prison sentence it had imposed for kidnapping to be served consecutively to the four-year prison sentence imposed for felonious assault and the aggregate six-year prison sentence imposed for the two firearm specifications. The trial court did this upon finding, among other things, that (1) the imposition of consecutive sentences was necessary to protect the public from future crime or to punish Perry; (2) the imposition of consecutive sentences was not disproportionate to the seriousness of Perry's conduct and to the danger Perry poses to the public; and (3) Perry's history of criminal conduct demonstrates that consecutive sentences were necessary to protect the public from future crime committed by Perry. The trial court also ordered Perry to pay court costs and notified Perry that, because of his conviction for first-degree felony kidnapping, he would be subject to a mandatory postrelease control term

of up to five years, but not less than two years, upon his release from prison. The trial court further advised Perry of his duties to enroll as a violent offender and ordered the forfeiture of Perry's various firearms and ammunition. The trial court issued the necessary judgment entries of sentencing six days later, on December 28, 2022, setting forth its sentencing decision. This included the trial court's consecutive sentence findings set forth above.

{¶ 14} On January 3, 2023, Perry moved the trial court to reconsider its sentencing decision. Three weeks later, on January 24, 2023, the trial court issued an entry denying Perry's motion. In so doing, the trial court correctly noted "that Ohio law does not recognize a mechanism for this Court to reconsider the sentence imposed." The trial court also noted, as an aside, the following:

> As a side note, the Court will mention that it was fully aware that the State's recommendation was a sentence of 12 years, with a further recommendation that the sentence not exceed a cumulative total of 20 years, excluding the maximum sentence required by the O.R.C. 2929.144, otherwise known as the Reagan Tokes Law. The Court considered the presentence investigative report, the defendant's written and oral statements, the written and oral statements of everyone who took the time to write and/or speak at Mr. Perry's sentencing hearing and the statements of [Perry's defense counsel] and the [state].

The trial court then ended its aside by noting, at the conclusion of Perry's sentencing hearing, it had "imposed a sentence that it believed was warranted and legally appropriate under all the facts and circumstances presented." Perry filed a timely notice of appeal later that day. Perry's appeal now properly before this court for decision, Perry has raised two assignments of error for review.

{¶ 15} Assignment of Error No. 1:

{¶ 16} APPELLANT'S GUILTY PLEAS WERE NOT MADE KNOWINGLY, INTELLIGENTLY OR VOLUNTARILY THEREBY VIOLATING HIS CONSTITUTION RIGHT TO DUE PROCESS UNDER THE UNITED STATES AND OHIO CONSTITUTIONS.

{¶ 17} In his first assignment of error, Perry argues the guilty pleas he entered in this case were not knowingly, intelligently, and voluntarily entered, thereby constituting a violation of his due process rights afforded to him under both the United States and Ohio Constitutions.

{¶ 18} "Due process requires that a plea in a criminal case be made knowingly, intelligently, and voluntarily." *State v. Willenburg*, 12th Dist. Clermont No. CA2008-06-066, 2009-Ohio-1454, ¶ 8, citing *State v. Engle*, 74 Ohio St.3d 525, 527 (1996). "Failure on any of those points renders enforcement of the plea unconstitutional under both the United States Constitution and the Ohio Constitution." *State v. Ackley*, 12th Dist. Madison No. CA2013-04-010, 2014-Ohio-876, ¶ 8. "Crim.R. 11(C) prescribes the process that a trial court must use before accepting a plea of guilty to a felony." *State v. Bishop*, 156 Ohio St.3d 156, 2018-Ohio-5132, ¶ 11. "The rule 'ensures an adequate record on review by requiring the trial court to personally inform the defendant of his rights and the consequences of his plea and determine if the plea is understandingly and voluntarily made.'" *State v. Murphy*, 12th Dist. Butler No. CA2021-05-048, 2021-Ohio-4541, ¶ 8, quoting *State v. Stone*, 43 Ohio St.2d 163, 168 (1975). This requires the trial court to notify the defendant of the constitutional rights set forth in Crim.R. 11(C)(2)(c) and to make the required determinations and give the necessary warnings in accordance with Crim.R. 11(C)(2)(a) and (b). *State v. Oliver*, 12th Dist. Clermont No. CA2020-07-041, 2021-Ohio-2543, ¶ 41. This includes a requirement that the trial court determine "that the defendant is making the plea voluntarily, with understanding of the nature of the charges and of the maximum penalty involved * * *." Crim.R. 11(C)(2)(a).

{¶ 19} Perry argues the guilty pleas he entered in this case were not knowingly, intelligently, voluntarily made because the trial court failed to advise him at the plea hearing that it was not bound by the state's recommended 12-year prison sentence and that he

could be sentenced to serve a prison term that was far greater than the state's recommendation. This failure, according to Perry, resulted in him leaving the plea hearing "under the impression" that the trial court would be sentencing him to the state's recommended 12-year prison term. To support this claim, Perry cites this court's prior decision in *State v. Hunley*, 12th Dist. Clermont No. CA2002-09-076, 2003-Ohio-5539, wherein this court stated:

> While a trial court should not completely disregard the sentence recommended by the state, it does not err by imposing a sentence greater than that forming the inducement for the defendant to plead guilty when the trial court forewarns the defendant of the applicable penalties, including the possibility of imposing a greater sentence than that recommended by the state.

*Id.* at ¶ 16.

{¶ 20} This court recently reiterated this holding in *State v. Benjamin*, 12th Dist. Clermont No. CA2021-06-023, 2022-Ohio-427, wherein this court similarly stated:

> We have held that a trial court is not bound by the terms of a plea agreement, including the recommended sentence, and can choose to deviate from the recommendation. However, in such a case, for the plea to be voluntary, the trial court must have forewarned the defendant of the possibility of imposing a greater sentence than that recommended by the prosecutor.

(Internal citations, quotation marks, and brackets omitted.) *Id.* at ¶ 18.

{¶ 21} Perry's argument would have merit if the record supported his claim. That is, if the transcript of the change of plea hearing said what Perry claims it does. But, after closely reviewing the record, including the change of plea hearing transcript itself, we find no merit to Perry's argument. This is because, contrary to Perry's claim, the trial court did advise Perry, although not in those express terms, that it was not required to sentence him to the state's recommended 12-year prison term. The trial court did this by advising Perry that he faced a maximum sentence, up to the parties' agreed upon 20-year cap, which was

far greater than the state's recommended 12 years. This included the trial court informing Perry that the felonious assault and kidnapping offenses alone carried a potential maximum minimum 19-year prison term. Therefore, given the record in this case, we find it clear that Perry entered his guilty pleas with an understanding of the nature of the charges and of the maximum penalties involved for each of the three offenses and two firearm specifications that he was pleading guilty. We also find it clear that Perry knew the trial court could sentence him to serve a prison term far greater than the state's recommended 12 years, up to the agreed-upon maximum 20-year cap. Perry's claim otherwise belies the record before this court and makes an issue where none otherwise exists. Accordingly, finding no merit to Perry's argument raised herein, Perry's first assignment of error lacks merit and is overruled.

{¶ 22} Assignment of Error No. 2:

{¶ 23} THE CONSECUTIVE SERVICE OF THE IMPOSED PRISON TERMS WAS UNSUPPORTED BY THE RECORD.

{¶ 24} In his second assignment of error, Perry argues the trial court erred by ordering the five-year prison sentence imposed for kidnapping to be served consecutively to the four-year sentence imposed for felonious assault and the aggregate six-year prison sentence imposed for the two firearm specifications. This is because, according to Perry, not all of the trial court's consecutive sentence findings were supported by the record as required by R.C. 2953.08(G)(2)(a). We disagree.

{¶ 25} The standard of review set forth in R.C. 2953.08(G)(2) governs all felony sentences. *State v. Simmons*, 12th Dist. Warren No. CA2020-10-069, 2021-Ohio-3563, ¶ 80. Pursuant to R.C. 2953.08(G)(2)(a) and (b), this court may modify or vacate a felony sentence only if, by clear and convincing evidence, "the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law."

*State v. Harp*, 12th Dist. Clermont No. CA2015-12-096, 2016-Ohio-4921, ¶ 7. "The consecutive sentence statute, R.C. 2929.14(C)(4), is one of the relevant statutes specifically mentioned in R.C. 2953.08(G)(2)." *State v. Richey*, 12th Dist. Clermont Nos. CA2022-08-038 thru CA2022-08-041, 2023-Ohio-336, ¶ 12, citing *State v. Gwynne*, 158 Ohio St.3d 279, 2019-Ohio-4761, ¶ 16. "Thus, there are two ways that a defendant can challenge consecutive sentences on appeal." *State v. Shiveley*, 12th Dist. Clermont No. CA2022-04-017, 2022-Ohio-4036, ¶ 7. The defendant can argue either that the imposition of consecutive sentences is contrary to law because the trial court failed to make the necessary consecutive sentence findings required by R.C. 2929.14(C)(4), or that the record does not support the trial court's consecutive sentence findings made under R.C. 2929.14(C)(4). *Id.*, citing *State v. Hawley*, 8th Dist. Cuyahoga No. 108254, 2020-Ohio-1270, ¶ 10. These are the only two means that the legislature provided to defendants to challenge their consecutive sentences on appeal. *State v. Gwynne*, Slip Opinion No. 2022-Ohio-4607, ¶ 11.

{¶ 26} As noted above, Perry argues the record does not support all the trial court's consecutive sentence findings as required by R.C. 2953.08(G)(2)(a). Such a challenge requires this court to review the record de novo and decide whether the record clearly and convincingly does not support the trial court's consecutive sentence findings. *Gwynne*, 2022-Ohio-4607 at ¶ 1. When so doing, this court "essentially functions in the same way as the trial court when imposing consecutive sentences in the first instance." *Id.* at ¶ 21. This court is constrained, however, to considering only those consecutive sentence findings that the trial court actually made. *Id.* This necessarily precludes this court from making our own consecutive sentence findings, as that is a task reserved for the trial court. *Id.* Therefore, upon a de novo review of the record, this court may reverse or modify consecutive sentences—including the number of consecutive sentences imposed by the

trial court—only if we clearly and convincingly find that the record does not support the trial court's consecutive sentence finding made under R.C. 2929.14(C)(4). *Id.* at ¶ 12. That is, only in circumstances where this court "has a firm belief or conviction that the proposition of fact represented by each finding is not true on consideration of the evidence in the record." *Id.* at ¶ 21.

{¶ 27} R.C. 2929.14(C)(4) sets forth the required consecutive sentence findings the trial court must make prior to imposing consecutive sentences. *Gwynne*, 2022-Ohio-4607 at ¶ 10. Initially, the trial court must find that consecutive sentences are necessary to protect the public from future crime or to punish the offender. *State v. Dillon*, 12th Dist. Madison No. CA2012-06-012, 2013-Ohio-335, ¶ 9. The trial court must then find that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. *State v. Heard*, 12th Dist. Butler Nos. CA2014-02-024, CA2014-02-025, and CA2014-05-118, 2014-Ohio-5394, ¶ 10. Lastly, the trial court must find "that at least one or more of the aggravating factors in R.C. 2929.14(C)(4)(a) through (c) are present."[3] *State v. Grate*, 164 Ohio St.3d 9, 2020-Ohio-5584, ¶ 205, 172; *State v. Liming*, 12th Dist. Clermont Nos. CA2018-05-028 and CA2018-05-029, 2019-Ohio-82, ¶ 25. Those three circumstances are:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
>
> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately

---

3. This court's use of the words initially, then, and lastly to describe the required consecutive sentence findings set forth under R.C. 2929.14(C)(4) should in no way be interpreted to mean that is the order those findings must be made. The order those findings must be made, if any, is not at issue in this appeal.

reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

**{¶ 28}** Perry does not challenge all the trial court's consecutive sentence findings made pursuant to R.C. 2929.14(C)(4). Perry argues only that the trial court erred by finding the imposition of consecutive sentences was not disproportionate to the danger he posed to the public. This requires Perry to show, through clear and convincing evidence, that the trial court erred by finding the imposition of consecutive sentences was not disproportionate to the danger he posed to the public. *Shiveley*, 2022-Ohio-4036 at ¶ 22. The term "clear and convincing evidence" means "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, ¶ 22, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus; *State v. Sanders*, 12th Dist. Butler CA2001-03-068, 2002 Ohio App. LEXIS 1432, *3-*4 (Mar. 29, 2002) (similarly defining the term "clear and convincing evidence" to mean that "which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established").

**{¶ 29}** Perry argues the trial court erred by finding the imposition of consecutive sentences was not disproportionate to the danger he posed to the public because a "close review" of the record "demonstrates that Mr. Perry is not likely to commit crime in the future." We have closely reviewed the record and, unfortunately for Perry, do not agree. We instead find the record replete with evidence to support the trial court's finding the imposition of consecutive sentences was not disproportionate to the danger Perry posed to the public. This includes, as noted by the trial court, the fact that Perry had been in trouble with the law

multiple times before this incident, none of which resulted in Perry turning his life around and following "the straight and narrow."

{¶ 30} This also includes Perry being convicted of fifth-degree felony obstructing official business, first-degree misdemeanor unlawful sexual conduct with a minor, assault, and operating a motor vehicle while under the influence of alcohol and/or drugs, and second-degree misdemeanor resisting arrest and criminal damaging. Perry has also had his driver's license suspended, as well as 13 other traffic related offenses. The record further indicates that Perry's ex-wife has an active protection order out against him because of Perry breaking into his ex-wife's backyard and destroying her security camera. This is in addition to Perry's disciplinary record while in jail following his arrest in this case, which indicates Perry had been involved in a physical altercation with another inmate. Therefore, because Perry cannot show, through clear and convincing evidence, that the trial court erred by finding the imposition of consecutive sentences was not disproportionate to the danger he posed to the public, Perry's second assignment of error also lacks merit and is overruled.

{¶ 31} Judgment affirmed.

PIPER and M. POWELL, JJ., concur.